CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY

v.

ALFRED M. HOYT ET AL.

*Covenant—Action of—Pleading—Assignment of Breaches—Of Readiness to Perform—Effect of Former Decision.*

1. This court is bound by its decision on a former appeal in the same cause, whether right or wrong.

2. If the words of a covenant, taken in connection with the remainder of a deed, do not mean the same as when they are separated from their context, a breach assigned in the words of the covenant is ill.

3. In an action of covenant brought by appellees, who had leased from appellant certain land and erected an elevator thereon, to recover dam-

ages from appellant for failure to furnish to appellees for storage the amount of grain which it had contracted in the lease to furnish, this court holds, that the covenant upon which breaches were assigned was in effect a covenant by appellant that the grain should be brought to the elevators in readiness to be received there, and that the breach should have been assigned, not in the words of the indenture, but in accordance with its legal effect, and that readiness to perform on their part was not properly alleged by plaintiffs.

[Opinion filed February 9, 1892.]

APPEAL from the Superior Court of Cook County; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Mr. EDWIN WALKER, for appellant.

Mr. JOHN N. JEWETT, for appellees.

GARY, J.  This is an action of covenant, by the appellees against the appellant, upon an indenture, the parts of which material to the present case are as follows:

" This agreement, made this eighteenth day of February, A. D. 1880, between the Chicago, Milwaukee and St. Paul Railway Company, party of the first part, and Jesse Hoyt, Alfred M. Hoyt, Theodore I. Husted and Leonard Hazeltine, doing business under the firm name and style of Jesse Hoyt and Company, of the city of New York, and Perry H. Smith and George L. Dunlap, of the city of Chicago, parties of the second part.  Witnesseth:

" 1.  That said party of the first part hereby leases, demises and lets for the period of ten (10) years from the first day of January, 1881, to the said parties of the second part, lots three (3), four (4) and five (5), of block K of the original town of Chicago, at an annual rental of three thousand eight hundred and fifty (3,850) dollars, to be paid quarterly on the first day of January, April, July and October of each year, together with all taxes and assessments that may be levied upon said premises during the term of said lease.

" 2.  The said parties of the second part agree to erect, build and construct on said lots three (3), four (4) and five

(5), a grain elevator of the capacity of seven hundred thousand (700,000) bushels or more, during the year 1880, and further agree to complete the same, ready for business, with all reasonable dispatch; said elevator to be constructed in the usual manner of grain elevators in the city of Chicago, and in all respects to be a first-class elevator, with suitable and proper foundations and machinery, with proper bins for storing different kinds of grain, and different grades, and with all the modern improvements and appurtenances of a first-class elevator, for the transaction of the business of receiving, storing and discharging grains, and to be constructed to the satisfaction of the said party of the first part, in these respects.

"3.    The said party of the first part agrees to lay all necessary tracks adjacent to said elevator, to connect its railway therewith for the purpose of delivering grain in cars thereto, and keep the same in repair during the time of this lease, and agrees to deliver on said tracks, in cars at said elevator, to the parties of the second part, all the grain that may be brought by its railway consigned to parties in the city of Chicago, so far as the party of the first part can legally control the same, for handling and storage in said elevator.

"4.    The said parties of the second part agree to receive, handle and store said grain as delivered, in the usual manner of handling grain in the city of Chicago, to the extent of the capacity of said elevator so to be constructed, and in addition agree that they will use for the same purpose, so far as their other engagements will allow, the elevator now standing on lots one (1) and two (2) of said block, and that said party of the first part shall at all times be entitled to storage for its grain to the extent of at least one million (1,000,000) bushels.

"The parties of the second part, with the consent of the party of the first part, may receive grain for storage from other parties and from river and canal craft, but in case such grain is so received, so as to reduce the capacity of the parties of the second part to accommodate the party of the first part, to the extent of one million (1,000,000) bushels in said

elevators, the said parties of the second part agree to furnish storage in other elevators to the party of the first part, to the extent that their capacity is so reduced without expense to the said party of the first part for switching or otherwise.    *    *    *

"8.    In consideration of the agreements aforesaid, the said party of the first part agrees that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year during the term of this lease, and in case it shall fall short of that amount, the said party of the first part agrees to pay to the said parties of the second part one cent per bushel on the amount of such deficiency, settlements to be made at the close of each year; and whenever it shall appear, at the close of any year, that the total grain received during so much of the term of this lease as shall then have elapsed, does not amount to an average of five million bushels for each year, the party of the first part shall pay to the parties of the second part one cent per bushel for the amount of such deficiency; but in case it shall afterward appear that the total amount received up to that time equals or exceeds the average amount of five million bushels per annum, the amount so paid to the parties of the second part shall be refunded, or so much thereof as the receipts of the year shall have exceeded five million bushels, so that the whole amount paid on account of deficiency shall be refunded should the total receipts for the entire term equal or exceed fifty million bushels in all on an average of five million bushels for each year."

The declaration contains two counts, the second the fullest, which, before assigning breaches, alleges:

"And the plaintiffs aver that they and said Jesse Hoyt and Perry H. Smith in their lifetime, from the dates of said indenture and the amendment thereto, have in all ways performed and fulfilled all the covenants, undertakings and promises in said indenture contained, by them to be performed and kept, and carried out all the obligations resting upon them by reason thereof, according to the true sense and meaning of said indenture and the amendment thereto,

and that they entered into possession of said lots three (3), four (4) and five (5), demised as aforesaid to them by the defendant on, to wit, the first day of May, 1880, and ever since then have remained in possession of them, paying the rentals of the amounts and at the times specified therefor in said indenture, to the defendant, and also all taxes and assessments on said lots, as required therein.

"And said plaintiffs also aver that they erected, built and constructed upon said demised lots, during the year 1880, a grain elevator of the capacity of 700,000 bushels and had the same completed ready for business as required by the said agreement and at the time required, and that they constructed the same as a first-class elevator, with the foundations, machinery, appliances, appurtenances and modern improvements mentioned in said indenture, and that said elevator was constructed by them to the satisfaction of said defendant.

"And the plaintiffs aver that from the date of the completion of said elevator as aforesaid, ready for business, they furnished to the defendant therein and in the other elevator mentioned in said indenture as then standing upon lots one (1) and two (2) of said block K, storage room for grain to the amount by them, the plaintiffs, required to be furnished under said agreement, that is to say, to the amount of one million bushels, and at all times have been ready and willing to furnish the storage for grain to the defendant that was so as aforesaid required to be furnished to it by them in said two elevators.

"And the plaintiffs further aver that from the date of the completion of said elevator they have at all times held and reserved for the use of said defendant the one million bushels of storage capacity stipulated for in said agreement, and received, stored and handled in and by means of the storage capacity aforesaid, so set apart and held for the use of said defendant, all the grain tendered by the said defendant for storage and handling which could be received, stored and handled in and by means of the said storage capacity of one million bushels, in the usual manner of handling grain in

the city of Chicago, and that, in the usual and customary manner of handling grain in the city of Chicago at the date of said agreement and for many years prior thereto, and continuously thereafter, it was easily practicable to receive, store and handle annually, in and by means of an elevator storage capacity of one million bushels, a very large amount of grain in excess of said actual storage capacity, to wit, five millions of bushels of grain and upward.

"And the said plaintiffs further aver that from the date of the completion of the said elevator as aforesaid, upon said lots 3, 4 and 5 of said block K aforesaid, to wit, the first day of January, A. D. 1881, up to and until the first day of January, A. D. 1888, the average amount of grain delivered by said defendant at said elevators for storage and handling therein and thereby was less than five million bushels per annum."

And breaches are assigned as follows:

"1st breach: But the said plaintiffs aver that, notwithstanding the said defendant in said indenture of lease and agreement, covenanted that the total amount of grain received at said elevators should be at least five million bushels on an average for each year during the term of said lease, yet the amount of grain received in said elevators during the year 1888, during which year there was kept for the defendant the full storage capacity in said elevators of one million bushels agreed upon in said indenture, was less than the five million bushels covenanted by the defendant to be received therein during said year by three million one hundred and sixteen thousand five hundred and twenty-one (3,116,521) bushels, by reason of which the defendant, according to the terms of the indenture aforesaid, became and was bound at the close of said year 1888, to pay to the plaintiffs for said deficiency for the year 1888, the sum of thirty-one thousand one hundred and sixty-five dollars and twenty-one cents ($31,165.21).

"2d breach: And for a second breach the said plaintiffs aver that notwithstanding the said defendant in said indenture of lease and agreement covenanted that the total amount

of grain received at said elevator should be at least five mill-ion bushels on an average for each year during the term of said lease, yet the amount of grain received at said eleva-tors during the year 1888, during which year there was kept for the defendant the full storage capacity in said elevators of one million bushels agreed upon in said indenture, and a large part of which was wholly vacant and unoccupied, was less than the five million bushels covenanted by the defend-ant to be received at said elevators during said year by three million one hundred and sixteen thousand five hundred and twenty-one (3,116,521) bushels, by reason of which the defendant, according to the terms of the indenture afore-said, became and was bound at the close of said year 1888, to pay the plaintiffs for said deficiency for the year 1888, the sum of thirty-one thousand one hundred and sixty-five dollars and twenty-one cents ($31,165.21)."

A judgment for the appellees was reversed upon a former appeal (37 Ill. App. 64) on three points:

First. That the covenant upon which the breaches are as-signed, is in legal effect a covenant by the appellant that the grain should be brought to appellees in readiness to be received at said elevators, and that the breach should be assigned, not in the words of the indenture, but in accordance with that legal effect.

Second. That the appellees should aver their readiness and willingness to receive the grain.

Third. That the appellees must show a deficiency for the whole expired term, and not merely for the year 1888.

Right or wrong, we are now bound by that decision. Flower v. Brumbach, 30 Ill. App. 294; Allemania Ins. Co. v. Peck, 33 Ill. App. 548.

The appellees, on the remand of the case to the Superior Court, substituted two new counts for the former one; the appellant demurred, the demurrer was overruled, and dam-ages assessed and judgment entered for the appellees, from which this appeal is prosecuted.

Why, in the amended declaration, the objections to the original declaration were not removed, in the instruct-

ive words of the brief of the counsel of the appellee, in another connection, "is no business of the court." That he agrees with us as to the legal effect of the covenant is shown by his brief, where he says that " the St. Paul Company agreed that the amount of grain *delivered* at said elevators for handling and storage should be at least 5,000,000 bushels on the average." And again that the company " *guaranteed* that the amount so *delivered* should be 5,000,-000 bushels per annum on an average." Not only because we are bound by the former decision, but because the law is so, we hold that the breaches are not well assigned. If the words of a covenant, taken in connection with the residue of the deed, do not mean the same as when they are separated from their context, a breach assigned in the words of the covenant is ill. Sicklemore v. Thistleton, 6 M. & S. 9.

The pleader has unnecessarily, at great length, stated the acts of the appellees in performance of their covenants. The first fifty words of that narrative would have been sufficient. Byrne v. McNulty, 2 Gilm. 424.

But readiness to receive the five million bushels, either on an average or in any one year, is not alleged. True, they aver that they were " ready and willing to furnish the storage for grain to the defendant that was so as aforesaid required to be furnished to it by them in said two elevators." That, however, was but one million bushels under covenant four. Then, in a long sentence next following, they reach the result that it " was easily practicable " for them to have received the five million. That may be an inconclusive argument that they were ready and willing, for from the whole tenor of the deed it may fairly be inferred that it would have been for their interest, but it is not good pleading.

The extent of the obligation of the appellant itself to deliver, is measured by covenant three. If all the grain from all sources that came to the elevators was five million, then, though not a bushel was brought by appellant, covenant eight was performed. And if ten million came

from other sources, and the appellant had not performed under covenant three, it would have been liable for a breach of that covenant. In considering, therefore, whether a breach of covenant eight is shown, the source whence the grain came is to be laid out of view, and the averment that the defendant did not deliver five million shows no breach of a covenant that five million should come. In that particular, therefore, the declaration has not been improved.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*